All right, our final case for this morning is Lawler v. Peoria School District. Mr. Stegall. Thank you, Judge Wood, Judge Bower, Judge Keenan. Always a pleasure. This is a Rehabilitation Act. Peoria School District receives federal funds, so it applies the Standards of Americans with Disabilities Act, so I'll refer to it in ADA terms, as most cases do. Lawler was a tenured special education teacher at Peoria 150. She had been assigned to B.E.D. students. So Illinois doesn't, actually there's been litigation about this, but at the time we're different certificate for experts in learning disabilities versus experts in behavioral and emotional disabilities. It's just all one certificate. So her certificate allows her to teach the behavioral, I'll just call it the behavioral disability kids. Yes, or I've used B.E.D. just, I don't know, they may have changed it by now. The problem is too many abbreviations and you lose us. Yeah, okay, I'll use, what was the word again? Behavioral, sorry, thank you, you're right, the behavioral kids. And her first, her supervisor had problems with her ability to handle that. That's Mary Camp. Yes, and she viewed it as well, she's assigned here, I can't grade her for overall capabilities, which since she's been assigned here and is qualified, she gave her a satisfactory ranking. Lawlor had a long-term problem with post-traumatic stress disorder. But the district doesn't know anything about that at first, right? Oh no, they don't, but they learn about it real quickly when Peoria has its areas, and this is one of them, where the inner city school is below the bluffs, it's gang areas as bad as some of the places you can find in this city, as I saw in the news last night, and she is getting ice cream the two weeks when the teachers are there before the students, and she watches an attempted murder with an abdominal wound. Post-traumatic stress disorder was originally the first psychiatric thing I think was diagnosed, goes back to World War I with shell shock, they would find decorated veterans that wouldn't be able to handle it. So we know about that, but let me divert you into the state court litigation, and I'd like you to explain your position on the question whether the state court judgment is dispositive of this, why it's not, why it doesn't preclude this claim. Well, the main, the best position we have, and I think controlling, is acquiescence. They let us, we didn't ever get a chance to make our choice to go with the union or not, because they never raised it until a year and a half. So you'd been litigating along, you had a case management plan, I assume, discoveries going on. Oh yeah, we'd been litigating fully, and never, and of course the federal court can't hear what the union's bringing, and this was a union action, as Judge Shadid found. They picked two plaintiffs, as unions do, and these happened to be the two. There was federal jurisdiction for it, and then a year and a half later, this and the other companion case, they say, oh, claim splitting. Now, Judge Shadid also on a Colorado River basis saw distinctions between those, and I would argue that that tips the balance on the equitable doctrine of res judicata, but let's say- Well, it's two things. I mean, Colorado River is designed to reconcile parallel litigation while it's still ongoing in both courts, and Judge Shadid, maybe at the time he went through the million factors of Colorado River, had the parallel litigation. Once the state court finished, it becomes a 1738 issue, it becomes- Yes, ma'am, it does. What I'm saying is, though, his factual findings were, this involved totally different things. That involved the union contract, and the contract plus the newly amended statute on, can you downsize and then say, sorry, call it back, and then somebody who's got a position like Lawler did that she's entitled to remediation, does that allow them to fire her because she's on the second level? The appellate court said two to one, yes. That's about as far afield from this Rehabilitation Act as you could get, I think, fairly, but the strongest one is a year and a half. And we had no choice by then. We were brown-sided, and there is federal jurisdiction for this. So when she asks for the transfer after this male student has slammed her into the wall and so forth, at that point she is alerting the school district, correct, that she's got a psychological condition. Right, and it's undisputed. It's the basis of the request. Yes, and she gave a very succinct September 21st report, which I've appended. Dr. Hammond, I'm sorry I misspelled the psychologist's name, I note it in a brief, but he gives two recommendations, two weeks off, not unusual in those situations, and get her away from these behavioral students. And then her letter, her email, sorry, it's a little hard to read that as the withdrawal of the transfer request. She says, I realize that my request for a transfer is not a guarantee, but I wouldn't read that sentence to say there's no more requests. It's just, as I understand, I may win or lose. Well, yes, and she went to her union, of course, and they said, you can't do anything, so you've got a choice, continue to work with behavioral students or lose your job. And in the meantime, she went back and She gets the letter from Dr. Gross then? Yeah, she goes and gets another letter from Dr. Gross. Now, Judge Shannon looked at the records. He wasn't deposed because he's in Texas or something, and it was his record. Well, we know that's a long way off. Well, I can just explain to you, that's one of the sides of litigation sometimes that Judge Bauer remembers from her trial court days. And it was simple enough. I mean, he's the primary care physician who's the gatekeeper. Okay, Judge Shannon says, well, that's inadmissible because he's treating her for a shoulder. Well, I don't think you can say that fairly on the record, given the inferences, because a primary care physician is the gatekeeper, knows everything about you, and he doesn't have to be actually treating her, if the psychologist is, to know the PTSD and why she can't be around the behavioral students. But even if you take all that, there's no way that the HR director could think that was withdrawn. Mary Camp and her successor, Carolyn Nunn, said, oh, they saw a copy of that letter, said she can't teach. It took her off, so she goes down again to talk to the same HR director and says, nope, you don't get to transfer. The excuse given by Dunn in her deposition was, well, you didn't do your paperwork. Well, the response to that is twofold. One, doctors never do the paperwork perfectly, but hey, that report from Hammond is as good as you're going to get. And the other thing is, look at what they did when she deteriorated so badly she had to be taken off work totally. The assistant to the human resources director sends the paperwork to Hammond, and he fills it out. All right, you're into your rebuttal. Yes, thank you. Keeping things moving along here. Mr. Eisenhammer. May it please the court. The district in this case reasonably accommodated her disability. When did they, why did they do that? How did they do that, I guess? How did they do that? The doctor. She gets, let's just take it a step at a time. She has this assault incident, and I don't think the district is responsible for anything before that because they don't know that she has, at least as I understand the record, they don't know that. But she then gets the, Dr. Hammond's letter is received by Terry Dunn, September 21st. Correct. And there's a clear request for, there are two things in this, a request for two-week leave, a request for a transfer. She gets the two-week leave, but then there's some dispute about why the request for the transfer is denied. Dunn says, she says there's additional information needing. Lawler says there was no such request. She's told during the meeting that the request is denied. So we've got a factual dispute. And then there's this email, which I think is impossible to read, is a withdrawal of the request for a transfer. It's just an acknowledgement, maybe it'll be granted, maybe it won't. And then there's the district's strange reaction to the Dr. Gross letter left on the phone. It's a photocopier. I don't see where the district is trying to accommodate her. Well, they accommodated her by giving her a two-week leave. But that wasn't an answer, one way or the other, to the transfer request. To the transfer. She never gets a focus on, you know, what can we do with your mental disorder that Dr. Hammond has now told us about? Dr. Hammond said in his note, I don't have it, but she needs two weeks to clear her head and she should get a transfer. They immediately grant the transfer. The two weeks. They don't ever grant the transfer. But they immediately grant the leave. Two days later, she comes in with a note and says, I can, I'm better now, sleeping through the night, I am confident I can come back and do the job that I was hired for. I realize that my request for a transfer is not a guarantee. Right, which means that... Why does that mean, and so I'm no longer requesting it? It may not be. In fact, our position, but it's a dispute and I'll get into why it's immaterial, we said we didn't deny it, we asked for more information. Right, but that is disputed. Right, but it's immaterial because she said I could come back, she came back and did not complain about coming back until five months later after she gets an unsatisfactory evaluation. But there's something strange about the timing of the evaluation as well, it's earlier than it ordinarily would have been. Yeah, it is, I mean, usually, apparently, it's like March or April, this is in February. Well, it's not in the record, but under the Peoria contract, all evaluations have to be done by February 1st. Well, it's not in the record. I know, but you are, neither is the record about why it's unusual, so... Well, it's a different time from the other times when she had gotten evaluations, I'll say that. So from her experience, it was different. So we engage in an interactive process. How? What did you do? Well, she brings in the doctor's note, we meet with her, we grant her the leave, she then brings in the note and says I can come back to work. We put her back to work, and the interactive process is a two-way street. So she doesn't say, hey, I didn't mean I couldn't come back to work or I needed to transfer. Well, here's the next formal thing that happens. Mary Camp finds the Dr. Gross letter, sends Lawler home, says contact HR. So Lawler says she met with Terry Dunn that same day, yes, she lived nearby, explains that she understands that the transfer request has been denied, but that she's still going to try to push it. She's going to get this Dr. Gross letter, give it to the union. She still wants a different placement. That's her testimony. I understand that Dunn says she doesn't remember this meeting, but that's just a dispute of fact. She's competent to testify to a meeting that she participated in personally. So why don't we have to assume at this stage the meeting takes place and that she reiterates her interest in a transfer? Also, the record shows that Lawler saw our doctor the day before, or the week before, who cleared her of her shoulder problems. Right, I'm not worried about my shoulder. But it doesn't say anything about post-traumatic shock, which is what she's claiming. You know, when the note comes back in February, it's Hammond who's talking about post-traumatic shock. The note has, and that's why Judge Shader ruled that it's irrelevant because he never pleaded that she couldn't work because of her shoulder. She pleaded because she had PTSD, which Hammond allowed her to come, and Hammond allowed her to come back. So she, you know, that goes back to the other thing. From the district's point of view, her doctor and she said at the end of the leave, I can come back to work. They put her back to work. Her doctor said that too? Yes. Her doctor sent a note six days after she sent her note saying, I'm clearing her to go back to work. But then we have the October 3rd letter, eMERGE should transfer out of BED program due to injury and into an environment with students with learning disabilities. Thank you for your consideration. Right. That was her shoulder injury, but it had nothing to do with the PTSD, which she is arguing. Except that she says that she said it did. You know, she says in this meeting, this is the meeting that Dunn denies remembering. The letter says it's an injury. He was treating her for an injury, which the doctor's notes demonstrate. It wasn't for PTSD. Dr. Hammond, it wasn't like he took over. Dr. Hammond treated her in September. Yeah, I mean, a lot of people have a primary and a special. Right, but okay. So, and Dr. Hammond then told us later, it was again Dr. Hammond treating her for the PTSD. Right. It wasn't Dr. Gross. Well, what's the first thing that you should be offered, whatever weeks it was, related to the shoulder? No. And the only thing related to the post-traumatic stress disorder was the second transfer? No. The first leave, the two-week leave was related to her PTSD. It came from Dr. Hammond, the doctor who was treating her for that and the leave. And our position, the leave, what, you know, our position is that yes, we agree. Does he say that? I mean, I. Well, yeah, I think he does in his note. Well, the September 21 letter says in the first line, it's PTSD. And then his recommendations are down at the bottom, number one, number two, please call me if you have any questions. And he spells out a little bit about what triggers the PTSD. Not everything, not all the way back to the beginning of her life, you know, but some. But the answer is here. For the school district to just assume it's all over with and leaving things so up in the air seems like it's, whatever it is, it's not accommodation. I mean, it's not the interactive process. It's coming to a decision that there is no accommodation needed. No, we gave her the two week leave. She came back. The duty is satisfied if we give her an accommodation, maybe not what she would want, but one that allows her to come back in reasonable comfort. Is leave a typical accommodation? Yes, it is. Leave is an accommodation. Leave is considered a normal accommodation on the seventh circuit and the other circuits. So she was allowed to come back. And the other circuits? But that's the seventh circuit too. So she was allowed to come back. And I want to emphasize that the interactive process is a two-way street. She didn't come back, Dr. Hamby didn't come back and write a note saying, you know, hey, you misunderstood what I said. She needs an immediate transfer because she can't handle the job. She didn't come back and say, I'll then present the note about the shoulder. My PTSD requires me to be off. I can't work. She stayed on the job for five months without incident relating to her mental condition, without complaint until she got her evaluation and the subsequent note. When she got the subsequent note, they again put her on leave and then was considering the transfer. She doesn't dispute that. And we gave her a transfer when she asked for it a year earlier in the record. So we did try to accommodate her. We can't be mind readers. And we do have to interact with her, but it requires her to interact with us. And looking at it from a reasonable employer, we put her back to work and she never complained. And she knows how to do it. So in our view, we did reasonably accommodate her. We did go through the interactive process. And it was unrelated to the dismissal as well as my time's up. So never to get to the race judicata, but for the race judicata issues that are in our brief. Okay, you briefed that. Thank you very much. Anything further, Mr. Stegall? I'm violating what I told the law students. But quickly, I think you can view this either as a interactive process case, or they just didn't give her the required accommodation. You read in SA-5, those two recommendations were alternatives. Two weeks off, pretty usual for when you have some sort of injury anyway. And that's standard. The second one, they never said flat out no, according to Lawler. And then she comes back. Didn't he write a subsequent note, though, saying she can come back? In which he did not repeat? Correct. The district requested that, which seems self-explanatory. But also, I mean, he did say in this very clear letter, should you have any, please call if you have any questions. And then you look at Gross's letter. I mean, he just says injury at work, 916. She cannot, she should transfer out of BED program due to injury. Well, this whole shoulder thing, this shows she clearly wants to transfer regardless. But this whole shoulder thing, how can the behavioral students, the shoulder problem be any different, really, than other students? I mean, that's a red herring. And that's my time. Thank you very much. All right. Thank you very much. Thanks to both counsel. Take the case under advisement. And the court will be in recess. Thank you.